1  Stuart M. Richter (CA 126231)
2  stuart.richter@kattenlaw.com
   Gregory S. Korman (CA 216931)
3  greg.korman@kattenlaw.com
   Andrew J. Demko (CA 247320)
4  andrew.demko@kattenlaw.com
5  KATTEN MUCHIN ROSENMAN LLP
   2029 Century Park East, Suite 2600
6  Los Angeles, CA  90067-3012
7  Telephone:  310.788.4400
   Facsimile:   310.788.4471
8

9  Attorneys for defendants
   HSBC Finance Corporation and Capital One, N.A.
10

11

12             **UNITED STATES DISTRICT COURT**

13             **CENTRAL DISTRICT OF CALIFORNIA**

14

15  GEORGE BURRIS and SHERRY      Case No.  CV14-2242-ABC-CWx
    BURRIS, individually and on behalf
16  of other persons similarly situated,   **DEFENDANTS' NOTICE OF**
                                           **MOTION AND MOTION TO**
17              Plaintiff                  **DISMISS PLAINTIFFS'**
                                           **COMPLAINT; MEMORANDUM**
18          v.                             **OF POINTS AND**
                                           **AUTHORITIES IN SUPPORT**
19
    HSBC BANK USA, NATIONAL
20  ASSOCIATION; and CAPITAL       Date:      June 23, 2014
    ONE, NATIONAL                  Time:      10:00 a.m.
21  ASSOCIATION,                   Place:     Courtroom 680
                                              (Roybal)
22              Defendants
23                                 [Defendants' Request for Judicial
                                   Notice and Declaration of Alan
24                                 Reedy filed concurrently]
25

26

27

28

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ......................................................................... 1

II.   BACKGROUND ......................................................................... 3

      A.    Credit Card Billing Regulation Overview..................................... 3

      B.    Plaintiffs' Cardmember Agreement ........................................... 5

      C.    Plaintiffs' Relevant Account Activity........................................... 6

            1.    Transactions during the May 8, 2011 to June 7,
                  2011 billing cycle ................................................... 7

            2.    Transactions during the June 7, 2011 to July 8,
                  2011 billing cycle ................................................... 7

      D.    Plaintiffs' Claims ........................................................... 8

III.  APPLICABLE LAW............................................................................. 9

IV.   THE COMPLAINT SHOULD BE DISMISSED
      BECAUSE THE CONTROLLING OFFICIAL STAFF
      COMMENTARY TO REGULATION Z DEFEATS
      PLAINTIFFS' UNDERLYING THEORY OF LIABILITY ................. 10

V.    EACH CLAIM ALSO FAILS FOR INDEPENDENT
      REASONS ......................................................................... 12

      A.    The FCBA Claim Should Be Dismissed Because
            Plaintiffs Failed To Give Any Valid Notice Of Billing
            Error And The Claim Is Time-Barred......................................... 12

            1.    Plaintiffs failed to allege the essential element of a
                  valid written notice of billing error, so the FCBA
                  was never violated. ............................................... 12

            2.    Amendment would be futile because Plaintiffs'
                  claim is barred by the one-year statute of
                  limitations......................................................... 14

B.   The Rosenthal Act Claim Should Be Dismissed Because Plaintiffs' Account Was Never Delinquent..................................15

C.   The Contract Claim Should Be Dismissed Because HSBC Did Not Breach The Cardmember Agreement. ...........................17

    1.   HSBC allocated excess payments as the Cardmember Agreement and Regulation Z allowed...........17

    2.   The Court should construe the allocation provision in the Cardmember Agreement in the same way as the allocation provision in Regulation Z. ...........................18

D.   The UCL Claim Should Be Dismissed Because Federal Law Expressly Permits HSBC's Allocation Methodology...........23

VI.   CAPITAL ONE IS INDEPENDENTLY ENTITLED TO DISMISSAL BECAUSE NO ACTIONABLE CONDUCT IS ALLEGED AGAINST IT ....................................................................24

VII.   CONCLUSION.....................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*,
129 S.Ct. 1937 (2009) ................................................................... 9

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................... 9

*Bernard v. Rockhill Dev. Co.*,
734 P.2d 1238 (Nev. 1987) ......................................................... 17

*Cel-Tech Commc'n, Inc. v. L.A. Cellular*,
20 Cal. 4th 163 (1999) ............................................................... 23

*Cnty. of San Diego v. State of Cal.*,
15 Cal. 4th 68 (1997) ................................................................. 16

*Cunningham v. Bank One*,
487 F. Supp. 2d 1189 (W.D. Wash. 2007) .................................. 12

*Davis v. HSBC Bank Nevada, N.A.*,
691 F.3d 1152 (9th Cir. 2012) .............................................. 23, 24

*Dawkins v. Sears Roebuck & Co.*,
109 F.3d 241 (5th Cir. 1997) ................................................ 12, 13

*Eichacker v. Paul Revere Life Ins. Co.*,
354 F.3d 1142 (9th Cir. 2004) .................................................... 19

*Ford Motor Credit Co. v. Milhollin*,
444 U.S. 555 (1980) ........................................................ 3, 10, 21

*Galardi v. Naples Polaris, LLC*,
301 P.3d 364 (Nev. 2013) .......................................................... 19

*Hauk v. JP Morgan Chase Bank USA*,
552 F.3d 1114 (9th Cir. 2009) .................................................... 24

*Hill v. Chase Bank USA, N.A.*,
No. 2:07-cv-82, 2010 WL 107192 (N.D. Ind. Jan. 6, 2010) .................. 13, 14

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F. 3d 970 (9th Cir. 1999) ...................................................... 9

*Johnson v. Capital One Bank*,
120 Cal. App. 4th 942 (2004) ..................................................... 16

*Johnson v. Wells Fargo Home Mortg., Inc.*,
635 F.3d 401 (9th Cir. 2011) ............................................ 3, 10, 24

*Karim v. Bank of Am., N.A.*,
   No. CA 10-519, 2011 WL 4457212 (D. R.I. May 6, 2011)...........................14

*Lagenfeld v. Chase Bank USA, N.A.*,
   537 F. Supp. 2d 1181 (2008)................................................... 14, 15

*Laguerre v. Nev. Sys. of Higher Educ.*,
   837 F. Supp. 2d 1176 (D. Nev. 2011)..........................................17

*Levi Strauss & Co. v. Aetna Cas. & Sur. Co.*,
   184 Cal. App. 3d 1479 (1986)...................................................19

*MacDonald v. Kassel*,
   629 P.2d 1200 (Nev. 1981) ......................................................21

*Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha,
   Inc.*,
   205 Cal. App. 3d 442 (1988)......................................................19

*NGA #2 Ltd. Liability Co. v. Rains*,
   946 P.2d 163 (Nev. 1997) .........................................................20

*Ponte v. Chase Bank USA, N.A.*,
   No. 12-13901, 2013 WL 2013 (E.D. Mich. Oct. 29, 2013).......................14

*Prescott v. U.S.*,
   731 F.2d 1388 (9th Cir. 1984) ...................................................16

*Reeder v. HSBC USA, Inc.*,
   No. 09-cv-2043, 2009 WL 4788488 (N.D. Ill. Dec. 8,
   2009)...............................................................................13

*Safeco Ins. Co. of Am. v. Robert S.*,
   26 Cal. 4th 758 (2001) ...........................................................19

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*,
   806 F. 2d 1393 (9th Cir. 1986) .................................................10

*Tavel v. Olsson*,
   535 P.2d 1287 (Nev. 1975) ......................................................21

## Statutes

12 U.S.C. § 5581 ....................................................................3

15 U.S.C. § 1640 ...........................................................3, 14, 15

15 U.S.C. § 1666 ...................................................................12

15 U.S.C. § 1666(a) ...............................................................13

15 U.S.C. § 1666a(A) and (B) ....................................................13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

15 U.S.C. § 1666c ..................................................................... 4, 9

Cal. Bus. & Prof. Code §17200 .............................................. 9, 23

Cal. Civ. Code § 1788.1 ................................................................ 9

Cal. Civ. Code § 1788.17 ............................................................ 15

Cal. Civ. Code § 1788.2(d) ......................................................... 15

Cal. Civ. Code §§ 1788.10-1788.13 ........................................... 15

**Other Authorities**

2-B Ahart, Cal. Prac. Guide: Enforcing Judgments & Debts
¶ 2:178.5 (Rutter 2013) ......................................................... 16

85 Ops. Cal. Atty. Gen. 215, 2002 WL 31440180 (Oct. 29,
2002)................................................................................. 15, 16

**Regulations**

12 C.F.R. § 1023.56 .................................................................... 10

12 C.F.R. § 1026, Supp. I, Comm. 53-2 .............................. passim

12 C.F.R. § 1026.13 ............................................................ 13, 14

12 C.F.R. § 1026.2 ........................................................................ 4

12 C.F.R. § 1026.53 ...................................................................... 5

12 C.F.R. § 1026.7 ........................................................................ 4

12 C.F.R. § 1026.8 ........................................................................ 4

75 Fed. Reg., 7657 (Feb. 22, 2010) .............................................. 4

**To all parties and their counsel of record:**

**Please take notice** that on June 23, 2014, in Courtroom 680 of the above-named court, located at 255 East Temple Street, Los Angeles, California 90012, the Honorable Audrey B. Collins presiding, defendant HSBC Finance Corporation as successor by merger to HSBC Bank Nevada, N.A., erroneously named as HSBC Bank USA, N.A. ("HSBC"), and defendant Capital One, N.A., will and hereby do move to dismiss the entire complaint by Plaintiffs George and Sherry Burris, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, because HSBC allocated Plaintiffs' payment exactly as federal law (*i.e.*, Regulation Z) allows.

Defendants further move to dismiss each claim for the following additional reasons:

1.    The second claim for Violation of the Fair Credit Billing Act, on the ground that Plaintiffs fail to allege a timely written notice of billing error to HSBC, and moreover, Plaintiffs' claim arose, if ever, in 2011 and is now barred by the applicable one-year statute of limitations, 15 U.S.C. § 1640(e).

2.    The third claim for Violation of the Rosenthal Fair Debt Collection Practices Act, on the ground that delinquency is a necessary prerequisite to the Rosenthal Act; Plaintiffs never became delinquent, so the Rosenthal Act never applied and was never violated.

3.    The first claim for Breach of Contract, on the ground that no provision of the contract was breached; HSBC applied Plaintiffs' payment to the balances and APRs as of the then-outstanding billing statement, as the contract allows.

4.    The fourth claim for Violation of the California Unfair Competition Law, on the ground that the "safe harbor" doctrine immunizes the com-

Katten
KattenMuchinRosenmanLLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

1  plained-of conduct because Regulation Z expressly authorized HSBC's pay-

2  ment allocation.

3        This motion is based on this Court's file, this notice, the attached memo-

4  randum of points and authorities, the concurrently filed request for judicial no-

5  tice, any arguments advanced at the hearing, and any other matter of which the

6  Court may or must take judicial notice.

7        This motion is made following the conference of counsel pursuant to

8  L.R. 7-3, which took place on April 15, 2014.

9                          Respectfully submitted,

10 Dated: May 16, 2014        KATTEN MUCHIN ROSENMAN LLP

11

12                          By:   /s/  Gregory S. Korman

13                              Attorneys for defendants HSBC Finance
                            Corporation and Capital One, N.A.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiffs George and Sherry Burris allege that HSBC Finance Corporation's predecessor misallocated one credit-card payment they made three years ago. Their theory fails entirely because HSBC allocated their payment exactly as federal law and their contract (which incorporates federal law) allowed.[1]

Plaintiffs were HSBC credit card customers. Each month they received a billing statement reflecting, among other things, all transactions during the preceding billing cycle, and the minimum payment due. The statement for the billing cycle that ended on June 7, 2011 showed Plaintiffs had an outstanding total balance of $2,090.33, and a minimum payment due of $55.00. Four days into the *next* billing cycle—the cycle for the period from June 7, 2011 to July 8, 2011—Plaintiffs took a cash advance of $700.00; per their contract, cash advance balances are subject to a higher annual percentage rate ("APR") than purchases. Later that week, on June 17, 2011, Plaintiffs made a payment of $880.00. These transactions appeared in the billing statement for the cycle that ended on July 8, 2011.

Plaintiffs take issue with the way HSBC allocated their $880 payment. They contend HSBC should have, under federal law and their agreement, applied the portion of the payment above the $55 minimum amount due (for the *prior* billing cycle) to the cash advance balance (taken in the *then-current* billing cycle), because cash advances have a higher APR. They are wrong.

While federal law requires HSBC to allocate amounts over the minimum payment to higher APR balances first, it gives HSBC discretion to select *when* the allocation will be performed. Under Regulation Z, HSBC may allocate a

---

[1]   Plaintiffs' credit card was issued by HSBC Bank Nevada, N.A., which has since merged with and into HSBC Finance Corporation, which is the correct defendant.

Katten
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

payment in excess of the minimum payment due based on the balances and APRs that exist "on the day the preceding billing cycle ends."  12 C.F.R. Pt. 1026, Supp. I, Comm. 53-2.

In other words, Regulation Z allows HSBC to allocate any payments Plaintiffs made between June 7, 2011 and July 8, 2011 to the balances and APRs on their account as of June 7, 2011. *That is exactly what HSBC did, and Plaintiffs do not and cannot allege otherwise*. And on June 7, 2011, the day the preceding billing cycle ended, only one tier of APRs applied on Plaintiffs' account. Thus, it is not that HSBC failed to allocate the payment to a balance with a higher-APR balance, but rather that Plaintiffs had no higher-APR balances to allocate between. For this reason alone, Plaintiffs' complaint should be dismissed without leave to amend.

Additionally, Plaintiffs causes of action should be dismissed without leave to amend for these independent reasons:

- Plaintiffs' Fair Credit Billing Act ("FCBA") claim does not allege the essential element of timely written notice of a billing error, and it is barred by the one-year statute of limitations;

- Plaintiffs' Rosenthal Act claim fails because the account never became delinquent, and the Rosenthal Act does not apply to current credit card balances;

- Plaintiffs' breach of contract claim fails because the cardmember agreement, properly construed, mirrors Regulation Z and, in any event, nowhere mandates that HSBC must allocate payments in "real time," *i.e.*, based on the balances and APRs as of the date the payment is made; and

- Plaintiffs' Unfair Competition Law ("UCL") claim fails because Regulation Z, which expressly authorized HSBC's allocation

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

1    method, provides a "safe harbor" that immunizes HSBC's conduct

2    from liability.

3    All these reasons apply equally to both defendants, but for Capital One,

4    dismissal is necessary for a more fundamental reason: Plaintiffs do not allege

5    that Capital One misallocated a single one of their payments, which is the un-

6    derlying basis for all their claims. For these reasons and as set forth more fully

7    below, the Court should grant the motion and dismiss the complaint.

8    **II.    BACKGROUND**

9    **A.    Credit Card Billing Regulation Overview**

10    Credit card billing is regulated primarily by the FCBA, which is part of

11    the Truth in Lending Act ("TILA"), and its implementing regulation, Regula-

12    tion Z. Regulation Z was promulgated originally by the Board of Governors of

13    the Federal Reserve System (the "Board") and now by the Consumer Financial

14    Protection Bureau (the "Bureau").[2] The Board, and now the Bureau, issue Of-

15    ficial Staff Commentary interpreting Regulation Z.

16    That commentary is dispositive unless demonstrably irrational. *Ford*

17    *Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980) ("Unless demonstra-

18    bly irrational, Federal Reserve Board staff opinions construing the Act or Reg-

19    ulation should be dispositive"); *Johnson v. Wells Fargo Home Mortg., Inc.*,

20    635 F.3d 401, 417 (9th Cir. 2011) ("We have been directed to treat these offi-

21    cial staff interpretations of Regulation Z as controlling unless demonstrably

22    irrational."). In fact, compliance with Regulation Z and the official staff inter-

23    pretations precludes civil liability under TILA altogether. 15 U.S.C. § 1640(f).

24

25    [2]    Effective July 21, 2011, the Dodd-Frank Act transferred rulemaking au-

26    thority from the Board to the Bureau. 12 U.S.C. § 5581(b)(1). The Bureau then
      renumbered Regulation Z so that its sections begin with "10" instead of "2."

27    Former regulation 12 C.F.R. § 226.1 became 12 C.F.R. § 1026.1, former
      § 226.2 became § 1026.2, and so on. For convenience, Defendants generally

28    use the Bureau's numbering convention.

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

Under Regulation Z, a company that issues a credit card is a "card issuer." 12 C.F.R. § 1026.2(a)(7). A card issuer generally must send a "periodic statement," commonly known as a billing statement, once every billing cycle. *Id.* § 1026.7; *accord* § 1026.2(a)(4) (defining a "billing cycle" or "cycle" as the "interval between the days of regular periodic statements."). A billing statement must include the previous balance, *id.* § 1026.7(b)(1), identify all transactions made during the previous billing cycle, *id.* §§ 1026.7(b)(2), 1026.8, state the minimum payment due, *id.* § 1026.7(b)(13), reflect the due date for a payment, *id.* § 1026.7(b)(11), and provide the "closing date of the billing cycle and the account balance outstanding on that date," *id.* § 1026.7(b)(10).

Different APRs can apply to different balances on the same account. Historically, card issuers had discretion to allocate payments across balances with different APRs as they saw fit. Most card issuers allocated payments "first to the balance with the lowest annual percentage rate, resulting in the accrual of interest at higher rates on other balances." 75 Fed. Reg. 7657, 7727 (Feb. 22, 2010). That discretion was curtailed effective February 22, 2010, when the CARD Act amended TILA. Under the current regime, issuers can still allocate minimum payments as desired, but they "shall apply amounts in excess of the minimum payment amount first to the card balance bearing the highest rate of interest, and then to each successive balance bearing the next highest rate of interest, until the payment is exhausted." 15 U.S.C. § 1666c(b)(1).

The Board amended Regulation Z to implement the new payment-allocation requirement, also effective on February 22, 2010. 75 Fed. Reg. at 7658. It also provides that for payments "in excess of the required minimum periodic payment" the card issuer "must allocate the excess amount first to the

balance with the highest annual percentage rate" and then to any lower-APR balances. 12 C.F.R. § 1026.53(a).

The Official Staff Commentary explains that the payment-allocation requirement gives issuers the discretion to select the point in time on the account *when* they will perform the required allocation:

> 2. Applicable rates and balances. Section 1026.53 permits a card issuer to allocate an amount paid by the consumer in excess of the required minimum periodic payment *based on the annual percentage rates and balances on the day the preceding billing cycle ends*, on the day the payment is credited to the account, or on any day between those two dates.

12 C.F.R. Pt. 1026, Supp. I, Comm. 53-2 (emphasis added).[3]

Thus, while the card issuer is obliged to allocate excess payments to balances with higher APRs first, it may do so based on the balances and APRs as of the end of the previous billing cycle.

## B.   Plaintiffs' Cardmember Agreement

Plaintiffs were issued an HSBC Platinum MasterCard in 2006. (Compl. ¶ 11.) The terms for use of the card were set forth in a written Cardmember Agreement and Disclosure Statement (the "Cardmember Agreement"). (*Id.*)

Per historical industry practice, the Cardmember Agreement initially provided that HSBC would apply payments at its discretion. The agreement read in 2006: "At our discretion, payments are generally applied to interest, fees, and then principal balances. We may apply your payments to lower APR balances before higher APR balances. The application of payment is subject to

---

[3]   The allocation date generally must be consistent from billing cycle to billing cycle but can change from time to time. *Id.*

Katten
KattenMuchinRosenmanLLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

change at any time, without notice." (Declaration of Alan Reedy ("Reedy Declaration"), ¶ 11, Ex. B.)

Then the Cardmember Agreement was amended to reflect the new federal payment-allocation requirements. The contract amendments were effective February 22, 2010, coinciding with the effective date of the CARD Act and Regulation Z. The cover letter enclosing the amendment advised "[t]hese changes support new federal credit card regulations." (Reedy Declaration, ¶ 14, Ex. B.)

The amended agreement mirrors the new federal regulations: "We apply the amount of your payment equal to the Minimum Payment Due at our discretion and generally to lower APR balances before higher APR balances. We apply any payment in excess of the Minimum Payment Due on your account to higher APR balances before lower APR balances." (Reedy Declaration, ¶ 14, Ex. B.)

Finally, the Cardmember Agreement contains a choice-of-law provision stating, "This Agreement and your Account will be governed by federal law and the laws of the state of Nevada . . . ." (Reedy Declaration, ¶ 11, Ex. B.)

**C.    Plaintiffs' Relevant Account Activity**

The transactions that are the subject of Plaintiffs' complaint occurred over two billing cycles in 2011. The first billing cycle covers the period from May 8, 2011 to June 7, 2011, and the second covers the next period from June 7, 2011 to July 8, 2011. The following summarizes the account activity in each billing cycle.

1          **1.**       **Transactions during the May 8, 2011 to June 7, 2011**

2                  **billing cycle**

3         Plaintiffs' account transactions for the period between May 8, 2011, and

4   June 7, 2011, are reflected in the billing statement with the Statement Closing

5   Date of June 7, 2011. The June 7, 2011 statement reflects an outstanding bal-

6   ance of $2,090.33 and a minimum payment due of $55.00. (*Id.* ¶ 14; Reedy

7   Declaration ¶ 15, Ex. D, pp. 76-77.) The June 7, 2011, billing statement also

8   showed that two potential APRs could apply: 19.99% for purchases and bal-

9   ance transfers, and 28.99% for cash advances. (*Id.* at 77.) But, as of the June 7,

10  2011 statement, Plaintiffs had no cash-advance balances subject to the higher

11  APR; they only had purchase balances subject to one APR:

12

13

14

15

16

17

| Interest Charge Calculation | | | |
|---|---|---|---|
| Your Annual Percentage Rate (APR) is the annual interest rate on your account. | | | |
| | | | |
| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
| PURCHASES 00001 | 19.99% (v) | $2,054.65 | $33.76 |
| CASH ADVANCES 80001 | 28.99% (v) | $0.00 | $0.00 |
| BALANCE TRANSFER 71111 | 19.99% (v) | $0.00 | $0.00 |
| v=Variable Rate | | | |

18  (*Id.*)

19         **2.**       **Transactions during the June 7, 2011 to July 8, 2011**

20                 **billing cycle**

21        The transactions during the next billing cycle—covering the period from

22  June 7, 2011 to July 8, 2011—are documented on the billing statement with a

23  Statement Closing Date of July 8, 2011. (Reedy Declaration ¶ 15, Ex. D, pp.

24  79-80.) The July 8, 2011 statement reflects that Plaintiffs charged $1,242.47 in

25  purchases during the cycle. (*Id.* at 79.) They also withdrew a $700.00 cash ad-

26  vance on June 11, 2011. (*Id.*; Compl. ¶ 15.) On June 17, 2011, Plaintiffs made

27  a payment in the amount of $880.00. (*Id.*; Compl. ¶ 16.)

28

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

This was the only payment Plaintiffs made during that billing cycle, (Reedy Declaration ¶ 15, Ex. D, p. 79), and therefore, the only payment corresponding to the June 7, 2011 billing statement. Had Plaintiffs not made that single payment during the cycle ending July 8, 2011, they would have defaulted under the payment terms of their Cardmember Agreement. (Reedy Declaration ¶ 10, Ex. B [Cardmember Agreement] ("You must pay at least the Current Payment Due in time to be credited to your Account by the Payment Due Date, and failure to do so constitutes a default of this Agreement.").)

HSBC applied the payment to the $55.00 minimum payment due and the excess to Plaintiffs' then-current balance due, all per the June 7, 2011 billing statement. (Reedy Declaration, ¶ 15, Ex. D, pp. 76-77, 79-80; Compl. ¶ 18.) Although in "real time" a higher-APR transaction had *posted* to Plaintiffs' account, there were no balances subject to higher APRs *due* on their account, or reflected on the June 7, 2011 billing statement, at the time they made their payment. (Reedy Declaration, ¶ 15, Ex. D, pp. 76-77.)

### D.    Plaintiffs' Claims

Plaintiffs allege that cash advances are subject to a higher APR than are purchases, so HSBC should have applied their $880.00 payment to the cash advance they took in the same billing cycle as that payment, even though that transaction would not be "due" until that billing cycle ended and the next billing statement issued. (Compl. ¶¶ 13, 18-19; Reedy Declaration ¶ 15, Ex. D, pp. 79-80, 82-83.)

Plaintiffs allegedly called HSBC to complain about this (Compl. ¶ 19), but never sent a *written* notice of billing error. HSBC declined to adjust their account as verbally requested. (*Id.*) Plaintiffs also allege that Plaintiffs' account was assigned to Capital One in 2013, and that despite more calls, Capital One also did not adjust their account. (*Id.* ¶ 20.) Although they name Capital

One in every claim, Plaintiffs never allege that Capital One misallocated any of their payments.

Plaintiffs allege HSBC and Capital One have wrongfully collected principal and interest due on the cash advance from June 17, 2011, through the filing of the Complaint. (Compl. ¶¶ 18-22; Reedy Declaration, ¶ 15, Ex. D, pp. 79-176.) Plaintiffs assert claims for themselves and on behalf of putative California and nationwide classes against HSBC and Capital One for (1) breach of contract; (2) violation of the Fair Credit Billing Act, 15 U.S.C. § 1666c; (3) violation of California's Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code §§ 1788.1 *et seq.*; and (4) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*

## III.   APPLICABLE LAW

A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*

Courts accept as true all material factual allegations in the complaint, but do not accept unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. *Ashcroft*, 129 S.Ct. at 1949-50. In addition to the pleading itself, courts may consider exhibits submitted with or alleged in the complaint as well as matters that may be judicially noticed. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999).

Leave to amend may be denied when the court determines that the "allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

## IV.  THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE CONTROLLING OFFICIAL STAFF COMMENTARY TO REGULATION Z DEFEATS PLAINTIFFS' UNDERLYING THEORY OF LIABILITY

Plaintiffs allege that HSBC breached its contract and violated the Fair Credit Billing Act, the Rosenthal Act, and the UCL because HSBC did not apply a payment to a cash advance transaction they took only days prior to their payment, in the same billing cycle. But Plaintiffs fail to analyze—or even cite—the Official Staff Commentary to Regulation Z, which interprets the FCBA. This controlling commentary confirms that HSBC acted lawfully in allocating Plaintiffs' payment based on the account's June 7, 2011 balances and APRs.

The Official Staff Commentary interpreting the payment-allocation rule has the force of controlling law, *Milhollin*, 444 U.S. at 565; *Johnson*, 635 F.3d at 417, and expressly authorized HSBC to do exactly what HSBC did. It explains that:

> Section 1023.56 permits a card issuer to allocate an amount paid by the consumer in excess of the required minimum periodic payment *based on the annual percentage rates and balances on the day the preceding billing cycle ends*, on the day the payment is credited to the account, or on any day between those two dates.

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

12 C.F.R. Pt. 1026, Supp. I, Comm. 53-2 (emphasis added).[4]

Plaintiffs' claims fail because HSBC did precisely what the commentary permits: it allocated payments in excess of the Minimum Amount Due based on the account balances on the day the preceding billing cycle ended. This is evident in Plaintiffs' billing statements, which are incorporated by reference into the complaint. The billing statements also show that, as of the allocation date, Plaintiffs' balances were subject to just one APR. Thus, it is not that HSBC failed to allocate payments between balances with different APRs, it is just that Plaintiffs did not have different APRs to allocate between.

The Official Staff Commentary dooms Plaintiffs' entire theory of the case. And because Plaintiffs could not in good faith amend to allege a violation

---

[4]    The Official Staff Commentary provides a relevant example to illustrate how the rule applies:

i. Assume that the billing cycles for a credit card account start on the first day of the month and end on the last day of the month. On the date the March billing cycle ends (March 31), the account has a purchase balance of $500 at a promotional annual percentage rate of 5% and another purchase balance of $200 at a non-promotional annual percentage rate of 15%. On April 5, a $100 purchase to which the 15% rate applies is charged to the account. On April 15, the promotional rate expires and § 226.55(b)(1) permits the card issuer to increase the rate that applies to the $500 balance from 5% to 18%. On April 25, the card issuer credits to the account $400 paid by the consumer in excess of the required minimum periodic payment. If the card issuer's practice is to allocate payments based on the rates and balances on the last day of the prior billing cycle, the card issuer would allocate the $400 payment to pay in full the $200 balance to which the 15% rate applied on March 31 and then allocate the remaining $200 to the $500 balance to which the 5% rate applied on March 31. In the alternative, if the card issuer's practice is to allocate payments based on the rates and balances on the day a payment is credited to the account, the card issuer would allocate the $400 payment to the $500 balance to which the 18% rate applied on April 25.

12 C.F.R. Pt. 1026, Supp. I, Comm. 53-2, ex. i.

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

of the Fair Credit Billing Act, or any of the other derivative causes of action which all turn on the erroneous allegation of misallocation, the Court should dismiss the case without leave to amend.

## V.     EACH CLAIM ALSO FAILS FOR INDEPENDENT REASONS

Not only is the underlying premise of the case wrong—because HSBC's allocation was proper—but each individual claim has additional defects warranting dismissal. Those defects are detailed below.

### A.     The FCBA Claim Should Be Dismissed Because Plaintiffs Failed To Give Any Valid Notice Of Billing Error And The Claim Is Time-Barred.

A creditor's duties under the FCBA are only triggered upon a valid written notice that conforms to the strict requirements in 12 C.F.R. § 1026.13(b). *Dawkins v. Sears Roebuck & Co.*, 109 F.3d 241, 243 (5th Cir. 1997). Because Plaintiffs have not alleged timely written notice of the allegedly misapplied payment, HSBC's duties under the FCBA were never triggered, and the FCBA was never violated. Moreover, whether they gave notice or not, Plaintiffs claim is barred by TILA's one-year statute of limitations, which accrued, at the latest, in 2011.

#### 1.     Plaintiffs failed to allege the essential element of a valid written notice of billing error, so the FCBA was never violated.

"To succeed on a claim under 15 U.S.C. § 1666, plaintiff must show (1) the existence of a billing error, (2) timely notification of the billing error, and (3) failure of the bank issuing the card to comply with the procedural requirements of Section 1666." *Cunningham v. Bank One*, 487 F. Supp. 2d 1189, 1191 (W.D. Wash. 2007). To be valid, a billing error notice must be (1) received by the creditor at the address listed for billing errors; (2) within 60

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

days after the creditor sent the first billing statement containing the alleged error; and (3) indicate the consumer's "belief and reasons for the belief that a billing error exists and the type, date, and amount of the error." 12 C.F.R. § 1026.13(b).

If the cardholder fails to timely raise a dispute, the creditor's duties under the FCBA are never triggered. *See Dawkins*, 109 F.3d at 243 ("To trigger a creditor's obligation to investigate and verify the disputed billing statement [under section 1666(a)], a consumer must send written notice to a creditor of the alleged error."); *Reeder v. HSBC USA, Inc.*, No. 09-cv-2043, 2009 WL 4788488, *10-11 (N.D. Ill. Dec. 8, 2009) ("The plain language of Section 1666(a) demonstrates that a creditor's obligations under the Act—including any obligation to correct a billing error—are triggered by written notice from the consumer."). Put simply, "[w]ithout a valid and timely notice of billing error, there's no duty to comply with § 1666a(A) and (B), and no violation of those sections." *Hill v. Chase Bank USA, N.A.*, No. 2:07-cv-82, 2010 WL 107192, at *6 (N.D. Ind. Jan. 6, 2010).

Assuming Plaintiffs have alleged a valid "billing error," *cf.* 12 C.F.R. § 1026.13(a), their FCBA claim still fails as a matter of law because Plaintiffs failed to give timely notice in writing. HSBC's duty to act under the FCBA— and therefore its potential liability—arises *only* upon written notice within 60 days of the first statement that reflects the billing error. *Id.* § 1026.13(b)**Error! Bookmark not defined.**; *Dawkins*, 109 F.3d at 243. Plaintiffs allege they called in to complain, but that does not satisfy the statutory requirement of written notice to a particular address within a specified period of time. Because Plaintiffs do not allege that they provided that written notice within 60 days of July 2011, HSBC's duties under the FCBA were never triggered, and no liabil-

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

1   ity exists. *See Hill*, 2010 WL 107192, at *6. Thus, the Court should dismiss
2   this claim.

3           **2.      Amendment would be futile because Plaintiffs' claim is**
4                     **barred by the one-year statute of limitations.**

5           Most courts agree that the statute of limitations does not come into play
6   unless and until there is a valid notice of billing error, because without a valid
7   notice there is no violation in the first place. *E.g.*, *Hill*, 2010 WL 107192, at *7
8   ("But as was previously discussed, Chase didn't have a duty to comply and no
9   violation occurred because the notices of billing error were deficient on their
10  face, so the statute of limitations never began to run."); *citing Lagenfeld v.*
11  *Chase Bank USA, N.A.*, 537 F. Supp. 2d 1181, 1204 (2008) (holding statute of
12  limitations did not bar claims because plaintiff never triggered any compliance
13  duties and no violations occurred).

14          As discussed above, Plaintiffs' claim should be dismissed for failure to
15  provide written notice of a billing error. But even if they could, in good faith,
16  allege providing one, the claim would still be time-barred by TILA's one-year
17  statute of limitations, which applies to FCBA claims. 15 U.S.C. § 1640(e); *Ka-*
18  *rim v. Bank of Am., N.A.*, No. CA 10-519, 2011 WL 4457212, at *9 (D. R.I.
19  May 6, 2011) (applying TILA one-year statute of limitations to dismiss FCBA
20  claim and citing cases).

21          The alleged billing error appeared in Plaintiffs' July 9, 2011 billing
22  statement. (Compl. ¶ 18.) Thus, any valid notice of billing error would have
23  had to be sent within 60 days of the July 9, 2011 statement; then HSBC would
24  have had 30 days to respond and 90 days to resolve the error. 12 C.F.R. §
25  1026.13(c). These statutory requirements fix the *outside* accrual deadline for
26  any FCBA claim in approximately November 2011. *Ponte v. Chase Bank USA,*
27  *N.A.*, No. 12-13901, 2013 WL 2013, at *13 (E.D. Mich. Oct. 29, 2013)
28

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

("Therefore, whether or not Ponte's letter actually stated a billing error that triggered Chase's duty to respond, any violation of TILA would have accrued at most 90 days after Ponte sent his letter").

Alternatively, assuming the notice requirement did not apply, the claim would still be time-barred. The applicable limitations period begins to accrue "from the date of the occurrence of the violation," 15 U.S.C. § 1640(e). That date was no later than in June 2011, when the payment was allegedly misallocated. Even if the Court selected the date Plaintiffs would have had *notice* of the alleged violation, *cf. Lagenfeld*, 537 F. Supp. 2d at 1204, that date would fall sometime in July 2011—when Plaintiffs' received their July 8, 2011 billing statement showing how the $880 payment was applied.

Plaintiffs therefore had *at most* one year from November 2011 to bring their FCBA claim. Yet they did not file suit until 2014, *several* years too late. No amendment can cure this defect so the Court should dismiss the FCBA claim without leave to amend.

**B.    The Rosenthal Act Claim Should Be Dismissed Because Plaintiffs' Account Was Never Delinquent.**

The Rosenthal Act is California's version of the federal Fair Debt Collection Practices Act. It prevents various unfair attempts at collecting debts, *e.g.*, Cal. Civ. Code §§ 1788.10-1788.13, and incorporates the federal act's requirements as well, *id.* § 1788.17. The Court should dismiss Plaintiffs' Rosenthal Act claim because their account was always current, and therefore never became "due and owing" under the statute. *Id.* § 1788.2(d).

The California Attorney General considered this exact issue and concluded that the Rosenthal Act only "applies to *debts that have become delinquent*, making them subject to collection." 85 Ops. Cal. Atty. Gen. 215, 2002 WL 31440180, at *3 (Oct. 29, 2002) (emphasis added). "In contrast, *credit*

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

card obligations that are 'current,' prior to becoming delinquent and before the date at which payment is required, *are not subject to the Act's requirements.*" *Id.* (emphases added).

California Attorney General opinions are "entitled to considerable weight." *Cnty. of San Diego v. State of Cal.*, 15 Cal. 4th 68, 103-104 (1997); *Prescott v. U.S.*, 731 F.2d 1388, 1393 (9th Cir. 1984) ("Although Attorney General opinions are not binding, they are entitled to great weight."). "In the absence of controlling authority," as here, "these opinions are persuasive 'since the Legislature is presumed to be cognizant of that construction of the statute,'" *Johnson v. Capital One Bank*, 120 Cal. App. 4th 942, 945-46 (2004), and "would have taken corrective action if it disagreed," *Cnty of San Diego*, 15 Cal. 4th at 104. Here, the Attorney General's construction of the Rosenthal Act as applying exclusively to past due or delinquent debts has remained unchallenged by the legislature for a decade.[5]

Applying this rule, Plaintiffs' Rosenthal Act claim fails. Plaintiffs do not and cannot allege their account ever became delinquent because it never did. Plaintiffs' billing statements demonstrate that their account was current throughout the relevant time period. (Reedy Declaration ¶ 15, Ex. D, pp. 79-176.) Without a delinquency, HSBC was never collecting a "debt" within the meaning of the Rosenthal Act. Accordingly, Plaintiffs' Rosenthal Act claim should be dismissed without leave to amend.

---

[5]     A leading debt-collection treatise cites the Attorney General Opinion for the same rule. 2-B Ahart, Cal. Prac. Guide: Enforcing Judgments & Debts ¶ 2:178.5 (Rutter 2013) ("Delinquent debts: The State FDCPA applies to 'debts that have become delinquent and subject to immediate collection activities,' conforming with the Federal FDCPA . . . . Thus, e.g., credit card obligations that are 'current' (not yet delinquent and before the payment due date) are not subject to the State FDCPA.") (*citing* 85 Ops. Cal. Atty. Gen. 215).

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

### C.      The Contract Claim Should Be Dismissed Because HSBC Did Not Breach The Cardmember Agreement.

A breach of contract claim under Nevada law has four elements: "(1) formation of a valid contract; (2) performance or excuse of performance by the plaintiff; (3) material breach by the defendant; and (4) damages." *Laguerre v. Nev. Sys. of Higher Educ.*, 837 F. Supp. 2d 1176, 1180 (D. Nev. 2011). The breach element "may be said to be a material failure of performance of a duty arising under or imposed by agreement." *Bernard v. Rockhill Dev. Co.*, 734 P.2d 1238, 1240 (Nev. 1987). Plaintiffs' breach of contract claim should be dismissed because they cannot plausibly allege that the Cardmember Agreement *required* HSBC to allocate payments as of the balances and APRs on the day their payment was credited, to the exclusion of all other possible allocation dates.

### 1.      HSBC allocated excess payments as the Cardmember Agreement and Regulation Z allowed.

Plaintiffs theorize that HSBC did not implement the requirements of the CARD Act and Regulation Z, or its contract with Plaintiffs, and simply allocated payments from low-to-high. That theory is wrong. From the effective date of the CARD Act forward, HSBC *always* allocated payments above the minimum payment due to highest-APR balances first. And it did so based on the balances and APRs at the end of the previous billing cycle, just as Regulation Z allows.

At the end of billing cycle preceding Plaintiffs' $880 payment, as reflected on their June 7, 2011 billing statement, there were *no* higher-APR balances on the account. Thus, as of the date HSBC used for allocation purposes, there was nothing to allocate between: all amounts then due on the account were subject to just one APR. Accordingly, there was no breach.

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

**2. The Court should construe the allocation provision in the Cardmember Agreement in the same way as the allocation provision in Regulation Z.**

The only way Plaintiffs' breach of contract claim could possibly survive is if the Court determines the Cardmember Agreement *required* HSBC to allocate based on balances and APRs in *real time*—as of the date the payment is made during the *current* billing cycle. Conversely, the breach of contract claim must be dismissed if the Court finds the contract *permitted* HSBC to allocate based on the methodology authorized by Regulation Z. As discussed next, the latter interpretation is correct; the Cardmember Agreement allows HSBC to allocate payments in the same way as does Regulation Z.[6]

The relevant provision of the Cardmember Agreement provides: "We apply any payments in excess of the Minimum Payment Due on your account to higher APR balances before lower APR balances." There are several reasons why this provision permits the allocation implemented by HSBC.

*First*, the provision is silent about *when* the allocation will be performed; that is, it does not expressly specify the day within each billing cycle HSBC will use to identify the balances and APRs for allocation. Reading into the Cardholder Agreement a requirement for "real time" payment allocation, *i.e.*, that payments must be allocated based on balances and APRs as of the day the payment is credited, would *add* a term that is not in the contract. This is forbidden.

"The court does not have the power to create for the parties a contract which they did not make, and it cannot insert in the contract language which

_____

[6]    Technically, the issue is even narrower: the claim must be dismissed if the Court decides the contract permitted HSBC to allocate based on the balances and APRs within one *week* of crediting the payment, because the cash advance transaction took place six days before the payment was credited.

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

one of the parties now wishes were there." *Levi Strauss & Co. v. Aetna Cas. & Sur. Co.*, 184 Cal. App. 3d 1479, 1486 (1986). "Courts will not add a term about which a contract is silent," *id.*, because to do so "would violate the fundamental principle that in interpreting contracts . . . courts are not to insert what has been omitted," *Safeco Ins. Co. of Am. v. Robert S.*, 26 Cal. 4th 758, 763-64 (2001). Following these principles, the Court should not insert a term mandating that HSBC's allocation must take place in "real time."[7]

Should the Court disagree, and conclude the date of allocation is a question of interpreting the contract rather than adding to it, the analysis differs but the result is the same. Industry custom and practice may be considered "to supply a missing term or to aid in interpretation if it does not alter or vary the terms of the contract." *Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha, Inc.*, 205 Cal. App. 3d 442, 451 (1988); *accord Galardi v. Naples Polaris, LLC*, 301 P.3d 364, 367 (Nev. 2013) ("We thus conclude, as other modern courts have, that '[a]mbiguity is not required before evidence of trade usage . . . can be used to ascertain' or illuminate contract terms.")

The industry custom here is readily apparent and judicially noticeable as it is imposed by uniform federal regulatory edict: issuers may allocate as of the day the last billing cycle ends, the day the payment is made, or any day in between. 12 C.F.R. Pt. 1026, Supp. I, Comm. 53-2. The only reasonable interpretation is that the allocation in the contract mirrors the allocation under federal law—the custom in the industry.

*Second*, the circumstances under which the Cardmember Agreement was amended leave no doubt that it was intended to incorporate the new federal

---

[7]      In the absence of in-state precedent, Nevada courts often look to California law for guidance. *Eichacker v. Paul Revere Life Ins. Co.*, 354 F.3d 1142, 1145 (9th Cir. 2004) ("Where Nevada law is lacking, its courts have looked to the law of other jurisdictions, particularly California, for guidance.").

regulations governing payment allocation. *See NGA #2 Ltd. Liability Co. v. Rains*, 946 P.2d 163, 167 (Nev. 1997) ("In interpreting a contract, 'the court shall effectuate the intent of the parties, which may be determined in light of the surrounding circumstances if not clear from the contract itself . . . .'"). All surrounding circumstances lead to the conclusion that the payment-allocation term in the contract should be interpreted the same as the federal regulation.

The intent to mirror federal law is evident from the iterative terms of the Cardmember Agreement, which have matched federal law as it changed over time. The agreement initially tracked Regulation Z before the CARD Act; it stated that HSBC would decide how to allocate payments. Then, when the law changed, the contract changed. The new law did not alter how minimum payments could be allocated, but required that payments above the minimum be allocated to balances with higher APRs first. The amendment to the contractual payment-allocation provision incorporates both aspects of that new regulation exactly. It retains discretion to allocate minimum payments, but excess amounts are allocated to higher-APR balances first. This intent is made explicit in the cover letter enclosing the amendment. It specifies that the changes support the "new federal credit card regulations." The terms of the agreement thus show that the amendment was intended to follow the federal law.[8]

The timing of the amendment confirms this intent. The February 22, 2010 effective date of the contract amendment coincides—*to the day*—with the effective date of the new federal payment-allocation provisions of the CARD Act and Regulation Z. In short, absolutely nothing suggests the amendment was intended to deviate from the new federal regulations, and eve-

---

[8]     The Cardmember Agreement gives further deference to federal law in the applicable law section, stating that the account is governed first by *federal* law, and then Nevada law.

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

rything demonstrates it was intended to mirror them entirely. The contract and its identical regulatory counterpart should be interpreted the same.

*Third*, if the Court were to go so far as to imply into the agreement a time during each billing cycle when HSBC is required to perform its allocation, the Court must imply a *reasonable* time. When a contract lacks a time for performance, courts properly imply a reasonable time under the circumstances. *Tavel v. Olsson*, 535 P.2d 1287, 1288 (Nev. 1975) ("Where an agreement does not contain a provision as to the period of duration the court will imply a reasonable time"); Restatement (Second) of Contracts § 204 (1981); *accord MacDonald v. Kassel*, 629 P.2d 1200, 1201 (Nev. 1981) ("This court has consistently held that what constitutes a reasonable period for performance must be determined from the nature of the agreement and the particular circumstances involved.").

To determine a reasonable time for allocation, the Court need look only to the judgment of the expert agencies tasked by Congress to make this determination for the entire credit card industry. The Board's interpretations of TILA have long received a unique level of judicial deference because the Board "has played a pivotal role in 'setting [the statutory] machinery in motion,'" because TILA "is best construed by those who gave it substance in promulgating regulations thereunder," and because Congress specifically designated the Board as the "primary source for interpretation and application of truth-in-lending law." *Milhollin*, 444 U.S. at 566.

The Board and its successor, the Bureau, both have expressly authorized issuers to allocate payments as of any time between the end of the last billing cycle and the payment date. The expert judgment of the responsible federal regulator, therefore, is that this allocation window reasonably balances the interests of card issuers and cardholders alike. It is necessarily a reasonable

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

timeframe for allocation in this case; at the least, it can never be deemed un-reasonable. Thus, if the Court were to imply a reasonable time for perfor-mance, it should be the window of time determined reasonable by the Board and the Bureau—the time that HSBC used.

*Finally*, the language of the Cardholder Agreement indicates that the touchstone date for the payment process is the end of the last billing cycle. When it was amended, the Cardholder Agreement expressly referred to and tied payments to the *Minimum Payment Due on your account*. (Reedy Declara-tion ¶ 14, Ex. B ("We apply any payments in excess of the Minimum Payment Due on your account to higher APR balances before lower APR balances.").) The Minimum Payment Due appears in just one place: the billing statement for the cycle that just ended. (Reedy Declaration ¶ 11, Ex. B ("Each statement you receive from us will identify a Minimum Payment and a Current Payment Due.").)

The "Due on your account" language also is instructive because no amount is "Due" until the *end* of the billing cycle. The agreement highlights this by explaining that the "Payment Due Date" will be "at least 20 days *after the close of your billing cycle* (the close of your billing cycle is the Statement Date on your billing statement)." *Id.* (emphasis added). It explains that "[i]f you do not pay at least the Minimum Payment and any amount past due in time to be credited to your Account by the Payment Due Date, you may be assessed a late payment fee" and failure to pay the Current Payment Due by the Pay-ment Due Date "constitutes a default of this Agreement." *Id.*

Everything points to the end of the last billing cycle as the critical mo-ment for all payment-related activity. At that critical moment, Plaintiffs had no balances subject to higher interest rates, so there was nothing to allocate be-tween. And any payments above the minimum due on the *next* billing state-

1   ment, and any statement after that, were, of course, allocated first to the new

2   cash-advance balance; Plaintiffs cannot and do not allege otherwise.

3       In short, Plaintiffs' belief that HSBC does not allocate payments as the

4   contract requires is wrong. The Cardmember Agreement contains nothing, ex-

5   pressly or impliedly, that would permit—much less require—deviation from

6   Regulation Z's payment-allocation requirements. There is certainly no term in

7   the Cardmember Agreement requiring "real time" allocation, nor even alloca-

8   tion based on balances and APRs within one week of the payment. Without

9   such a term imposing that requirement, there was no breach. As such, the

10  breach of contract claim fails and the Court should dismiss it with prejudice.

### D.   The UCL Claim Should Be Dismissed Because Federal Law Expressly Permits HSBC's Allocation Methodology.

13      California's UCL establishes three alternative bases of unfair competi-

14  tion: acts or practices which are unlawful, unfair, or fraudulent. Cal. Bus. &

15  Prof. Code § 17200. "In other words, a practice is prohibited as 'unfair' or 'de-

16  ceptive' even if not 'unlawful' and vice versa." *Cel-Tech Commc'n, Inc. v.*

17  *L.A. Cellular*, 20 Cal. 4th 163, 180 (1999). Under the safe-harbor doctrine,

18  however, any conduct that is expressly authorized by law is immune from UCL

19  liability. *Id.* at 182 ("If the Legislature has permitted certain conduct or con-

20  sidered a situation and concluded no action should lie, courts may not override

21  that determination. When specific legislation provides a 'safe harbor,' plain-

22  tiffs may not use the general unfair competition law to assault that harbor.");

23  *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1164 (9th Cir. 2012).

24      The safe-harbor doctrine applies specifically to UCL claims targeting

25  conduct that Regulation Z and TILA allows. *Davis*, 691 F.3d at 1165 ("We

26  have no trouble concluding that TILA and Regulation Z create a safe harbor

27

28

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

1    for Defendants' disclosures in the online application."); *see also Hauk v. JP*

2    *Morgan Chase Bank USA*, 552 F.3d 1114, 1122 (9th Cir. 2009).

3    As explained throughout, the Official Staff Commentary to Regulation Z

4    expressly authorizes card issuers to allocate payments as of the end of the last

5    billing cycle. 12 C.F.R. Pt. 1026, Supp. I, Comm. 53-2. The commentary has

6    the force of controlling law, *Johnson*, 635 F.3d at 417, and, therefore, the safe

7    harbor doctrine applies. Applying the staff commentary to Plaintiffs' allega-

8    tions, HSBC was expressly authorized to allocate Plaintiffs' June 17, 2011,

9    payment based on the interest rates and balances that existed on the day the

10   preceding billing cycle ended, *i.e.*, June 7, 2011. That is exactly what HSBC

11   did and, on that day, there were no balances to allocate between.

12   HSBC's federally authorized conduct falls with the safe-harbor doctrine

13   and cannot support liability under the UCL. *Davis*, 691 F.3d at 1164-65. The

14   Court should, therefore, dismiss the UCL claim without leave to amend.

15   **VI.   CAPITAL ONE IS INDEPENDENTLY ENTITLED TO**

16   **DISMISSAL BECAUSE NO ACTIONABLE CONDUCT IS**

17   **ALLEGED AGAINST IT**

18   All of the foregoing arguments apply equally to Capital One because

19   Plaintiffs seem to have added Capital One for the sole reason that it purchased

20   their account well after the alleged payment misallocation in 2011. So if the

21   Court finds that HSBC's allocation in 2011 was proper under law, then Plain-

22   tiffs' claims against HSBC—the actual alleged actor—fail, and Plaintiffs' de-

23   rivative claims against Capital One necessarily must fail as well.

24   But there is a deeper, more fundamental reason that the case against

25   Capital One should be dismissed no matter what happens to the claims against

26   HSBC. Every alleged violation of law—the FCBA violation, the breach of

27   contract, the Rosenthal Act violation, and the UCL violation—stems from one

28

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

act: the misallocation of a monthly payment. And that single payment was al-
legedly misallocated by HSBC, *not Capital One*. To be clear, Plaintiffs *never*
allege that Capital One misallocated *any* of their payments. Thus, Capital One
did not engage in the allegedly unlawful conduct that is the basis for this case.

Under Plaintiffs' own theory of liability, no claim against Capital One
survives. The FCBA claim is based on a misallocation; the contract claim is
based on misallocation; the Rosenthal Act is based on misallocation; and the
UCL claim is based on misallocation. Since Plaintiffs do not allege that Capi-
tal One misallocated any of their payments, all of these claims as to Capital
One should be dismissed.[9]

## VII.  CONCLUSION

For the foregoing reasons, HSBC and Capital One respectfully request
that the Court dismiss the complaint, and all claims asserted, without leave to
amend.

Respectfully submitted,

Dated:  May 16, 2014          KATTEN MUCHIN ROSENMAN LLP


By:   /s/ Gregory S. Korman
        Attorneys for defendants HSBC Finance
Corporation and Capital One, N.A.

---

[9]   To be sure, Plaintiffs complain about the higher interest they had to pay
to Capital One, after it bought the account, as a result of the single alleged
misallocation by HSBC in 2011. But higher interest incurred as a result of
HSBC's purported misallocation is just *damages*; it is not a separate instance
of misallocation by Capital One.